UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X
ROBERT DEREK LURCH, JR.,

Plaintiff,

-against-

EXODUS TRANSITIONAL SERVICES, OFFICER BEKIM NEBIJA, and DETECTIVE BRIAN BORBON,

Defendants.
---------------------------------------------------------X

**REPORT AND RECOMMENDATION**
22-CV-3948 (DG) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

Plaintiff Robert Derek Lurch, Jr. ("Plaintiff"), initiated this action *pro se* in June 2022 in the United States District Court for the Southern District of New York. *See generally* Compl., ECF 2. The case was transferred to this District shortly thereafter. June 29, 2022 ECF Transfer Order; Transfer Order, ECF 3. In the operative complaint, Plaintiff alleges that New York Police Department ("NYPD") officers unlawfully seized him in violation of the Fourth Amendment for ordering him to leave a hotel room he was occupying as a participant in a reentry program managed by Defendant Exodus Transitional Services ("Exodus") on threat of arrest. *See generally* Am. Compl., ECF 20.

Presently before the Court is Defendants Bekim Nebija and Brian Borbon's (the "Defendant Officers") motion to dismiss the amended complaint, which the Honorable Diane Gujarati referred to the undersigned Magistrate Judge. *See* Mot. to Dismiss ("Mot."), ECF 66; Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF 68; Mem. in Opp'n ("Opp'n"), ECF 71; Reply, ECF 72; Suppl. Opp'n, ECF 74; Feb. 25, 2026 ECF Order Referring Mot. For the reasons that follow, the Court respectfully recommends that the motion to dismiss be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Factual Background

According to Plaintiff's amended complaint, on February 5, 2021, Plaintiff was released from Rikers Island and contacted a jail to jobs program, Exodus Transitional Services, to re-enroll in their housing and job readiness program. Am. Compl., ECF 20, at ECF p. 10. An Exodus employee directed Plaintiff to meet at Exodus's Long Island City location, where Plaintiff was immediately accepted into the program due to his prior enrollment at another location. *Id.* Upon being accepted, Plaintiff attests that he agreed to certain terms and conditions outlined in a contract with Exodus to receive housing, housing services, and employment services. *Id.* Plaintiff notes that these terms included that: (1) Plaintiff would seek or obtain employment while enrolled in the program; (2) Plaintiff would not possess drugs while on Exodus's premises; (3) Plaintiff would attempt to seek or secure permanent housing; and (4) Plaintiff would not engage in violent conduct while on the premises. *Id.* Plaintiff also attests that he believes the contract also directed that he would "consent to all searches," but notes that he cannot remember. *Id.* Plaintiff contends that he complied with the terms of the contract, including searches. *Id.* at ECF pp. 10–11.

Plaintiff alleges that at some point between May 16 and May 22, 2021, he consented to a search upon his arrival to his Exodus-provided housing, a Fairfield Inn hotel. *Id.* at ECF p. 11. During the search, a security guard stated that Plaintiff did not fully empty his pockets. *Id.* Plaintiff states that even though his pockets were inside out, the security guard called over a case worker, Ms. Queen, to remind Plaintiff of the contract he signed. *Id.* Plaintiff asserts that a verbal altercation ensued, during which Ms. Queen addressed him "with an attitude" and reminded him about his contract. *Id.* Plaintiff then called Ms. Queen an expletive, which resulted in Ms. Queen telling

Plaintiff he was "out [of] the program." *Id.* Plaintiff replied that he cannot be kicked out of the program for calling her a name. *Id.* To this, Ms. Queen responded "watch me," called the police, and, ultimately, "got everyone to agree (including the head of administration of Exodus) to call the police and convince them that I did something that warranted removal (even though I wasn't in violation of any of the terms and conditions of the contract I signed)." *Id.* at ECF pp. 11–12 (capitalization altered).

Plaintiff avers that the first time that NYPD police officers arrived at the Fairfield Inn following this verbal altercation, they reviewed Plaintiff's contract and stated that nothing had been done in violation of it. *Id.* at ECF pp. 5, 8–9. Plaintiff alleges that the officers informed Exodus personnel that they had to allow Plaintiff to go back to his hotel room and that Plaintiff could not be evicted. *Id.* at ECF p. 5. Following this event, Plaintiff states that "[o]ver the next few days I had to miss school because Exodus employees kept threatening me that once I leave they are not letting me back in the room and they are going to throw my property out." *Id.* at ECF pp. 5–6. Plaintiff continues: "As a result of their threat, I had to barricade myself in my room as Exodus continued to call police in an attempt to get me unlawfully evicted," and goes on to recount Exodus's additional attempts to call police to evict him from his room. *Id.* at ECF p. 6.

Eventually, after four to five calls to law enforcement, Plaintiff alleges that on the final call to the police, "the officer viewed the contract but because Exodus employees pleaded with him to remove me (unlawfully), he told me I will have to leave or I will be arrested for trespassing (I subsequently left)." *Id.* As to this final incident, Plaintiff further alleges the following:

> After reviewing the terms and conditions and determining that the Plaintiff was not in violation of these rules, the Caucasian officer

> suggested after they pleaded with him to remove the Plaintiff that if they state I threatened them, he has no choice but to remove me.
>
> An Exodus employee then stated [']he threatened me['] and the officer that orchestrated the anticipated subsequent events approached me stating I have to leave because I threatened the staff.

*Id.* at ECF p. 8. Plaintiff asserts that he told the officer that the officer could not tell him to leave "because the 911 call did not say [that Plaintiff] threatened anyone" and that Plaintiff was in his room with the door shut when the officer arrived. *Id.* The officer then told Plaintiff that he would be arrested for criminal trespass if he did not leave the premises. *Id.* Plaintiff "then left not to violate" his parole. *Id.*

## II. Procedural History

Plaintiff first initiated this action by filing a *pro se* complaint on June 27, 2022, in the United States District Court for the Southern District of New York. *See generally* Compl., ECF 2. The case was transferred to this District on June 29, 2022. June 29, 2022 ECF Transfer Order; Transfer Order, ECF 3. On May 19, 2023, Judge Gujarati dismissed Plaintiff's complaint and granted Plaintiff leave to file an amended complaint by June 20, 2023. May 19, 2023 ECF Mem. & Order; Mem. & Order, ECF 14.

On June 22, 2023, Plaintiff filed a motion for an extension of time to file an amended complaint. Mot. for Extension, ECF 16. Plaintiff noted that, due to an address change, Plaintiff did not receive Judge Gujarati's May 19, 2023 order dismissing the complaint and directing Plaintiff to file an amended complaint. *Id.* On June 26, 2023, then-Magistrate Judge Sanket J. Bulsara granted Plaintiff's request and extended the deadline to file an amended complaint to July 20, 2023. June 26, 2023 ECF Order. When no such filing was made by Plaintiff by the ordered date, on August 4, 2023, Judge Gujarati *sua sponte* extended Plaintiff's deadline to file the amended complaint to August 25, 2023. Aug. 4, 2023 ECF Order. On August 14, 2023, Plaintiff filed a second

motion for an extension of time to file an amended complaint, requesting that he be given until September 15, 2023, to file an amended complaint due to his incarceration. Second Mot. for Extension, ECF 17. Judge Bulsara granted Plaintiff's request. Aug. 16, 2023 ECF Order. Following an additional extension, Plaintiff filed the amended complaint on October 20, 2023. Third Mot. for Extension, ECF 18; Sept. 22, 2023 ECF Order; Am. Compl., ECF 20. The amended complaint alleges claims against Defendants Exodus, an "Exodus staff member who called 911 and the ones who assisted this member" ("Exodus Staff Member"), "Officer John Doe who failed to intervene in the plaintiff being unlawfully seized," and "Officer John Doe who unlawfully seized [Plaintiff] in order to unlawfully evict" Plaintiff. Am. Compl., ECF 20, at ECF pp. 2–3 (capitalization modified). Following the filing of the amended complaint, Plaintiff filed a letter with the court asking for a status update and inquiring whether his claims "survive[d] the court's initial review or were they dismissed without prejudice." Pl. Letter, ECF 23. In response, Judge Bulsara directed Plaintiff to provide an address for Exodus Transitional Services, to which Plaintiff promptly responded, and summons for Exodus were issued on February 29, 2024. Feb. 1, 2024 ECF Order; Pl. Letter, ECF 24; Summons Issued, ECF 25. The U.S. Marshals effected service on March 20, 2024, and filed proof of service on April 15, 2024, after which Exodus answered the amended complaint. Proof of Service, ECF 27; Answer, ECF 28.

On November 7, 2024, counsel for Exodus filed a stipulation of dismissal, dismissing the claims between Plaintiff and Exodus with prejudice. *See* Stipulation of Dismissal, ECF 40. On November 8, 2024, Judge Gujarati issued an order directing Plaintiff to "either file a letter indicating whether Plaintiff intends to continue this action against the remaining non-appearing Defendants or file a notice of voluntary dismissal as to those Defendants" by November 15, 2024. Nov. 8, 2024 ECF Order. On November

14, 2024, Plaintiff filed a motion requesting to continue the matter as to the remaining unnamed defendants. Mot. to Continue, ECF 41.

On December 23, 2024, the case was reassigned from Judge Bulsara to the undersigned Magistrate Judge. Dec. 23, 2024 ECF Order Reassigning Case. In light of Plaintiff's prior indication that he was seeking to continue the case against the unnamed John Doe officer defendants, on January 3, 2025, the Court issued a *Valentin* order, directing the Corporation Counsel of the City of New York to ascertain the full names of the John Doe police officers alleged to have been involved in the incident underlying Plaintiff's amended complaint by February 17, 2025. Jan. 3, 2025 ECF Order. After requesting various extensions of the deadline to respond to the *Valentin* order due to difficulties in identifying the relevant officers, on August 18, 2025, Corporation Counsel responded to the Court's order, identifying records that indicated that NYPD Detective Brian Borbon and Officer Bekim Nebija responded to the 911 call by Exodus during Plaintiff's given timeframe. *Valentin* Resp. Letter, ECF 53. On August 19, 2025, in light of Corporation Counsel's representations, the Court deemed Plaintiff's amended complaint to be further amended to reflect the names of Officer Bekim Nebija and Detective Brian Borbon as Defendants. Aug. 19, 2025 ECF Order. On October 20, 2025, the Defendant Officers filed a letter proposing a briefing schedule on their anticipated motion to dismiss, which Judge Gujarati entered the following day. Def. Officers' Letter, ECF 60; Oct. 21, 2025 ECF Order.

On February 3, 2026, Defendants Borbon and Nebija filed a motion to dismiss Plaintiff's amended complaint. Mot., ECF 66. On that same day, the Defendant Officers filed a letter requesting that the court deem the motion to dismiss unopposed because "counsel for the Defendants has not received any opposition to the motion, nor does the civil docket indicate that any such filing, or request for additional time, has been made

by Plaintiff." Letter Request, ECF 70. On February 10, 2026, Judge Gujarati directed Plaintiff to "file a letter by February 27, 2026 indicating whether Plaintiff intends to continue this action as against Defendants Borbon and Nebija" and further advised Plaintiff "that failure to comply with this Order may result in dismissal of this action." Feb. 10, 2026 ECF Order (emphasis omitted). On February 12, 2026, Plaintiff filed an opposition to the motion to dismiss, and on February 26, 2026, the Defendant Officers submitted their reply. Opp'n, ECF 71; Reply, ECF 72. In the meantime, Judge Gujarati referred the motion to the undersigned for a report and recommendation. Feb. 25, 2026 ECF Order Referring Mot. On April 27, 2026, Plaintiff filed a supplemental opposition to the motion to dismiss. Suppl. Opp'n, ECF 74.

For the reasons discussed below, the Court respectfully recommends that the motion to dismiss be granted for failure to state a claim.

**DISCUSSION**

Based on the allegations described above, Plaintiff asserts a claim of unlawful seizure under 42 U.S.C. § 1983 against the Defendant Officers. *See generally* Am. Compl., ECF 20. The Defendant Officers advance three grounds for dismissing Plaintiff's amended complaint and the claim against them. The Defendant Officers argue that (1) the statute of limitations for Plaintiff's claim against the Defendant Officers has run and that relation back does not apply, (2) Plaintiff fails to state a claim of unreasonable seizure under Federal Rule of Civil Procedure 12(b)(6), and (3) qualified immunity. *See* Mem., ECF 68, at 5–17. In addition, the Defendant Officers argue that Plaintiff's *in forma pauperis* ("IFP") status should be revoked and that a filing injunction should be imposed against Plaintiff. *Id.* at 18–24.

## I. Legal Standard: Motion to Dismiss for Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff alleges facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which requires establishing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556); *see also Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (explaining that courts are "not required to credit conclusory allegations or legal conclusions couched as factual allegations" (quotation marks omitted)); *Jackson v. Nassau County*, 552 F. Supp. 3d 350, 364 (E.D.N.Y. 2021) ("'[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555 (internal quotation marks omitted))). At the motion to dismiss stage, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). When deciding a motion to dismiss, the court does not "weigh the evidence that might be presented at trial but merely . . . determine[s] whether the complaint itself is legally sufficient." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 713 (S.D.N.Y. 2012); *see Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In addition, although the scope of review for Rule 12(b)(6) motions is generally limited to the complaint, courts may consider some extrinsic materials, including "material that the complaint 'incorporate[s] by reference,' that is 'integral' to the complaint, or of which courts can take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991) (holding that the district court was entitled to consider documents incorporated in the complaint by reference and which were integral to the plaintiff's claim on a motion to dismiss).

Finally, "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). *Pro se* complaints, in particular, "'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (internal quotation marks omitted)). The Court is therefore required to interpret the submissions of a *pro se* litigant "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks omitted). To that end, "[w]here new allegations in a *pro se* plaintiff's opposition memoranda 'are consistent with the allegations contained' in the Complaint, they may be read 'as supplements to th[e] pleadings.'" *Vail v. City of New York*, 68 F. Supp. 3d 412, 427 (S.D.N.Y. 2014) (quoting *Boyer v. Channel 13, Inc.*, Nos. 04-CV-2137, *et al.* (JSR) (FM), 2005 WL 2249782, at *6 (S.D.N.Y. Mar. 9, 2005), *report and recommendation adopted*, Mar. 30, 2005 ECF Order Adopting R. & R., *in* No. 04-CV-2137 (S.D.N.Y. Mar. 30, 2005)); *see Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012); *see also Adkins v. City of New York*, No. 19-CV-3628 (GBD) (DF), 2020 WL 2950979, at *5 (S.D.N.Y. Jan. 3, 2020) (finding that "courts should act with particular care" before

dismissing a *pro se* plaintiff's complaint, "[e]specially in the civil rights context"), *report and recommendation adopted*, 2020 WL 1031130 (S.D.N.Y. Mar. 3, 2020). However, courts do not have to credit new causes of action raised for the first time in a *pro se* plaintiff's opposition.[1] *See, e.g.*, *Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008) (summary order) (affirming the district court's rejection of a new constitutional cause of action raised in *pro se* plaintiff's opposition). And, although a *pro se* complaint is "construed liberally . . . and interpreted to raise the strongest claims that it suggests," it must still state a plausible claim to relief. *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

## II. Analysis

### A. Statute of Limitations & Relation Back

Plaintiff brings a claim under 42 U.S.C. § 1983 for unlawful seizure in violation of the Fourth Amendment. For Section 1983 claims, the statute of limitations is "borrowed from state law, which, in the case of New York, confers . . . a three-year period." *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). Federal law, however, determines when a Section 1983 claim accrues and establishes that this three-year period begins to run "when the

[1] The Court notes that Plaintiff attempts to raise a number of additional claims in his supplemental opposition. Suppl. Opp'n, ECF 74. More specifically, first, Plaintiff attempts to allege a claim of unlawful eviction under New York law and Section 1983. *Id.* at ECF pp. 2–3. Second, Plaintiff asserts a Fourteenth Amendment due process claim against the Defendant Officers for fabricating allegations and manipulating "facts to justify state action," in relation to his seizure claim. *Id.* at ECF pp. 3–4. Third, Plaintiff asserts that the Defendant Officers and Exodus were "joint actors" for the purposes of Section 1983 liability. *Id.* at ECF p. 5. As established above, courts do not have to credit new causes of action raised for the first time in a *pro se* plaintiff's opposition. *See, e.g.*, *Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008) (summary order). Accordingly, the Court declines to consider these claims raised by Plaintiff for the first time in his supplemental opposition. Additionally, the Court notes that in reference to Plaintiff's arguments concerning "joint action" between the police and Exodus, to the extent Plaintiff is arguing that they were joint actors for purposes of establishing Exodus's liability under Section 1983, Plaintiff and Exodus have already stipulated to dismiss this action as to Exodus. *See* Stipulation of Dismissal, ECF 40.

plaintiff knows or has reason to know of the harm." *Shomo v. City of New York*, 578 F.3d 176, 181 (2d Cir. 2009) (quotation marks omitted); *see Hogan*, 738 F.3d at 518. For a claim of unlawful seizure, the limitations period "'begins to run at the time the claimant becomes detained pursuant to legal process.'" *Hagans v. Nassau County Police Dep't*, No. 18-CV-1918 (JS) (AYS), 2020 WL 1289529, at *5 (E.D.N.Y. Mar. 18, 2020) (quoting *Wallace v. Kato*, 549 U.S. 384, 397 (2007)); *see Sher v. City of New York*, No. 21-CV-1339 (DLC), 2022 WL 1294395, at *3 (S.D.N.Y. Apr. 29, 2022).

Given that the allegations in the amended complaint assert that the underlying events occurred "[b]etween the dates of May 16, 2021 to May 22, 2021," Plaintiff's claims would be time-barred at the latest by May 22, 2024. Am. Compl., ECF 20, at ECF p. 5. As noted above, following the filing of the stipulation of dismissal as to Exodus and Plaintiff's statement that he intended to continue the case against the additional unnamed defendants, on January 3, 2025, the Court issued an order directing Corporation Counsel of the City of New York to ascertain the full names of the John Doe officers alleged to have been involved in the incident described in Plaintiff's amended complaint. Jan. 3, 2025 ECF Order; *Valentin* Order, ECF 42. Following multiple extensions of time, Corporation Counsel provided identifying information as to these officers on August 18, 2025. *Valentin* Letter, ECF 53. On August 19, 2025, the amended complaint was "deemed amended to reflect the names of Officer Bekim Nebija and Detective Brian Borbon as Defendants" in place of the "John Doe" officers Plaintiff included in the amended complaint. Aug. 19, 2025 ECF Order.

"Generally, 'John Doe pleadings cannot be used to circumvent statutes of limitations because replacing a John Doe with a named party in effect constitutes a change in the party sued.'" *Hogan*, 738 F.3d at 517 (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir.1993) (internal citations omitted)). Here, as set forth in the

timeline above, when the amended complaint was further amended to reflect the names of the Defendant Officers, the statute of limitations had already run. Accordingly, in this case, Plaintiff's John Doe substitutions would need to satisfy the requirements of Federal Rule of Civil Procedure 15(c) to be deemed timely since "[a]mended pleadings that meet the requirements of Rule 15(c) are considered to 'relate back' to the date of the original complaint." *Id.*

Under Rule 15(c), "amendments to replace Doe defendants with named defendants normally do not relate back." *Sher*, 2022 WL 1294395, at *4. Rule 15(c) states:

> **(1) *When an Amendment Relates Back.*** An amendment to a pleading relates back to the date of the original pleading when:
>
> > **(A)** the law that provides the applicable statute of limitations allows relation back;
> >
> > **(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading; or
> >
> > **(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
> >
> > > **(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and
> > >
> > > **(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c). Rule 15(c)(1)(B) does not apply here as the amendment is to substitute a party, not assert an additional claim or defense. Additionally, Rule 15(c)(1)(C) does not apply because "the lack of knowledge of a John Doe defendant's name does not constitute a mistake of identity." *Hogan*, 738 F.3d at 518; *see Ceara v. Deacon*, 68 F. Supp. 3d 402, 407 (S.D.N.Y. 2014) (collecting cases). Therefore, only Rule

15(c)(1)(A) remains as a possible avenue for relation back. *See Sher*, 2022 WL 1294395, at *4 ("A plaintiff bringing a § 1983 claim can therefore rely on New York's relation back rules to substitute a named defendant for a Doe defendant." (citing *Hogan*, 738 F.3d at 518–19; N.Y. C.P.L.R. § 1024)). Under New York law, in order for the amendment to relate back, two requirements must be satisfied: (1) "the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name;" and (2) "the party must describe the John Doe party in such form as will fairly apprise the party that he is the intended defendant." *Hogan*, 738 F.3d at 519 (quotation marks and alterations omitted) (collecting cases).

Here, the Court finds that because Plaintiff sufficiently "describe[d] with particularity the date, time, and location of the alleged" incident, the second requirement has been met. *Id.*; *see Sher*, 2022 WL 1294395, at *4. The Court acknowledges that Plaintiff alleges that multiple calls were made to 911, resulting in responses from multiple sets of NYPD officers between May 16 through May 22, 2021 — the time period at issue.[2] *See generally* Am. Compl., ECF 20. Nevertheless, the amended complaint provides sufficient detail to put the Defendant Officers on notice. For example, the amended complaint details that "on the last call, the officer viewed the [Exodus] contract" and told Plaintiff that Plaintiff "will have to leave or [he] will be arrested." *Id.* at ECF p. 6. Additionally, Plaintiff describes: (1) the location of the alleged incident, the Fairfield Inn in Long Island City; (2) his conversation with the officers "on the day of the incident"; (3) how "the Caucasian officer suggested" to the Exodus

---

[2] The Court notes that while the Defendant Officers contend that "upon information and belief, this date range is also incorrect," the Court must consider Plaintiff's allegations as true for the purposes of evaluating a motion to dismiss. Mem., ECF 68, at 13 n.3; Reply, ECF 72, at 5 n.1.

employees "that if they state [Plaintiff] threatened them, he has no choice but to remove [Plaintiff]"; and (4) that Plaintiff "left not to violate" his parole after this discussion with the officers. *Id.* at ECF pp. 8–9. Moreover, Plaintiff described the officers as (1) "Officer John Doe who failed to intervene in the Plaintiff being unlawfully seized"; and (2) "Officer John Doe who unlawfully seized" Plaintiff and was a "white Caucasian male, 5 foot 7 to 5 foot 11." *Id.* at ECF p. 3 (capitalization altered).

Accordingly, Plaintiff has provided reasonably "sufficient information about the identity of Defendant[s], the location of the incident, and Defendant[s'] precise conduct" to satisfy the second prong of the analysis. *Ceara*, 68 F. Supp. 3d at 411 (collecting cases); *see Duncan v. City of New York*, No. 11-CV-3901 (ENV) (JO), 2014 WL 3530858, at *3 (E.D.N.Y. July 15, 2014) (finding that the plaintiff's description of "the precise conduct" attributed to the John Doe defendant was sufficient notice); *Kennedy v. City of New York*, No. 12-CV-4166 (KPF), 2015 WL 6442237, at *5–6 (S.D.N.Y. Oct. 23, 2015) (noting that "physical descriptions are not the only means through which a plaintiff may adequately put an intended defendant on notice" and finding that the plaintiff's allegations of "a specific time, date, place, and description of conduct sufficient to" put the intended defendant on notice); *cf. Santiago v. City of New York*, No. 15-CV-0517 (NGG) (RER), 2016 WL 11447843, at *6 (E.D.N.Y. Sept. 6, 2016) (finding lack of fair notice when the complaint "only indicates that a group of twenty officers engaged in unspecified actions, somewhere in Brooklyn, at some time on February 8, 2012"), *report and recommendation adopted*, 2016 WL 5395837 (E.D.N.Y. Sept. 27, 2016), *aff'd*, 697 F. App'x 36 (2d Cir. 2017) (summary order).

Notwithstanding the adequate notice provided here, whether Plaintiff exercised sufficient diligence to justify relation back is a closer question. As a threshold matter, the Court notes that "even *pro se* litigants have a responsibility to exercise due diligence

in identifying potential John Does," which "requires that a plaintiff show that he or she made timely efforts to identify the correct parties before the statute of limitations expired." *Sosa v. Bustos*, No. 17-CV-0417 (ER), 2020 WL 1940550, at *6 (S.D.N.Y. Apr. 22, 2020) (quotation marks and alterations omitted).

As detailed above, Plaintiff filed his original complaint on June 27, 2022, and filed his amended complaint on October 20, 2023. *See* Compl., ECF 2; Am. Compl., ECF 20. Both complaints refer to "John Doe officers." *See generally* Compl., ECF 2; Am. Compl., ECF 20. Although Plaintiff did submit letters requesting status updates on his case and promptly filed an address for Defendant Exodus when requested by Judge Bulsara, he took very little action to advance the identification of the John Doe police officers. *See generally* Docket. As set forth above, only on November 14, 2024, after being prompted by Judge Gujarati to indicate "whether Plaintiff intends to continue this action against the remaining non-appearing" Defendant Officers, did Plaintiff file a letter indicating his intention to continue the matter against the (at the time) unnamed Defendant Officers. Nov. 8, 2024 ECF Order; *see* Mot. to Continue, ECF 41. In response, following the transfer of this case to the undersigned, on January 3, 2025, the Court issued an order directing the Corporation Counsel to ascertain the names of the John Doe officers.[3] Jan. 3, 2025 ECF Order; *Valentin* Order, ECF 42. Following multiple

---

[3] To the extent that Plaintiff asserts that the City was on constructive notice prior to the identification of the Defendant Officers, the Defendant Officers state that, "because the City of New York was not named as a party, the Office of Corporation Counsel had no knowledge of this lawsuit until a *Valentin* Order was issued in January 2025." Reply, ECF 72, at 6. As reflected by the docket, the Corporation Counsel was not involved in the matter until the Court's issuance of the *Valentin* order, and therefore, any argument that the Defendant Officers were on constructive notice of the suit via Corporation Counsel or the City of New York is unavailing. *See generally* Docket.

extensions of time to respond,[4] the Corporation Counsel provided the names of the Defendant Officers on August 18, 2025, and the Court deemed Plaintiff's amended complaint to be further amended to reflect the now-named Officer Defendants. *See Valentin* Resp. Letter, ECF 53; Aug. 19, 2025 ECF Order.

The record does not demonstrate that Plaintiff made specific efforts, either before or after the filing of the amended complaint, to ascertain the Defendant Officers' true identities prior to the expiration of the statute of limitations. *See generally* Docket. Rather, as the Defendant Officers note, "despite filing multiple extension requests, status 'inquiries' and even entering discovery and settling his claim against Exodus, Plaintiff's first filing regarding the NYPD John Doe defendants occurred only after the Court ordered Plaintiff to announce his intentions regarding these defendants, several months after the statute of limitations expired." Mem., ECF 68, at 10; *see also* Docket. In addition, the Defendant Officers contend that even Plaintiff's filing indicating his intention to proceed with his claims against the Defendant Officers "fails to provide any description as to Plaintiff's efforts to identify the John Doe Defendants or request the Court's assistance in identifying them." *Id.* Although Plaintiff asserts in his opposition that "[w]hen a pro se plaintiff is unable to identify officers, courts issue a Valentin v. Dinkins, 121 F.3d 72 (2d Cir. 1997) order requiring the municipality to identify them," Opp'n, ECF 71, at ECF p. 5 (emphasis omitted), "Plaintiff cites to no case, and this Court has found none, indicating that a plaintiff's filing of a John Doe complaint and thereafter hoping for judicial assistance is sufficient to demonstrate due diligence for

---

[4] The Court notes that the Defendant Officers contend that the Corporation Counsel's multiple extension requests were needed "in part because Plaintiff provided virtually no information that would have assisted it in identifying the John Doe defendants beyond what was already vaguely asserted in his Amended Complaint." Mem., ECF 68, at 10 n.1.

purposes of § 1024." *Wheeler v. Buckley*, No. 16-CV-7441 (KMK), 2019 WL 2024005, at *6 (S.D.N.Y. May 7, 2019). Rather, "courts have consistently required that plaintiffs, including pro se plaintiffs, *themselves* take action to identify John Doe defendants." *Id.* (emphasis in original) (collecting cases); *see also Vasconcellos v. City of New York*, No. 12-CV-8445 (CM), 2014 WL 4961441, at *9 (S.D.N.Y. Oct. 2, 2014) (noting the plaintiff's lack of due diligence, including failure to "file a *Valentin* demand or take any other steps to identify the Officer Defendants until after the initial conference . . . , when the court (not counsel) entered a *Valentin* order directing the City to disclose the names of the officers").

As described in his complaints, Plaintiff knew on the date of the alleged incident "that multiple police officers were involved," but "Plaintiff took no concrete steps prior to the expiration of the statute of limitations three years later" to identify these individuals. *Wheeler*, 2019 WL 2024005, at *7 (collecting cases). Accordingly, the Defendant Officers' argument that Plaintiff failed to exercise due diligence is fairly compelling. However, notwithstanding Plaintiff's lack of diligence, the delays in this case getting underway were not solely attributable to Plaintiff: As reflected on the docket, various delays were caused in part due to the mandatory screening requirements of the Prison Litigation Reform Act ("PLRA"), Plaintiff's incarceration at certain times during the pendency of this case, and general docket congestion. *See generally* 28 U.S.C. § 1915A; Docket. The Court is also concerned that Judge Bulsara's response to Plaintiff's request for a status update as to whether his claims had survived may have created confusion as to the status of the Defendant Officers given that Judge Bulsara's response to Plaintiff's inquiry was to order Plaintiff to file an address for Exodus and was silent on whether Plaintiff's claims against the officers survived the

PLRA screening.[5] Although the Court does not know if this caused confusion as to whether the claims against the John Doe officers survived the PLRA screening or perhaps other uncertainty, the Court notes that Plaintiff promptly responded to Judge Gujarati's directive that he indicate his intentions as to the unnamed John Doe officers. Under these circumstances, the Court finds that although Plaintiff's efforts to ascertain the identities of the John Doe officers should have been significantly more diligent, Plaintiff did demonstrate some diligence and his ability to proceed as to these Defendants should not be time-barred. Rather, in light of his *pro se* status and the totality of the circumstances here, his claims should be found to relate back. *Cf. Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 550 (2010) (noting the "preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits"); *see also Tracy*, 623 F.3d at 101 (observing that "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants").

**B. Section 1983 Fourth Amendment Seizure Claim**

In order to maintain a claim under Section 1983, "two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the

---

[5] Notably, Plaintiff's letter seeking to inquire about the status of the PLRA screening was dated December 23, 2023, and was received by the E.D.N.Y. clerk's office on or about December 28, 2023, approximately three months prior to the statute of limitations deadline in March 2024, but for reasons unknown to the Court, the filing was not docketed until January 25, 2024. *See* Pl. Letter, ECF 23. After that, as noted *supra*, Judge Bulsara's next order directed Plaintiff to provide an address for Exodus but was silent as to Plaintiff's claims against the unnamed officers. *See* Feb. 1, 2024 ECF Order.

United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015). Such deprivations of constitutional rights are "only actionable against state actors or private parties acting under the color of state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quotation marks omitted). Here, Plaintiff's Section 1983 claim is based on an alleged unlawful seizure, in violation of the Fourth Amendment, by the Defendant Officers. *See generally* Am. Compl., ECF 20.

*1. Seizure Under the Fourth Amendment*

The Fourth Amendment protects the "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry v. Ohio*, the Supreme Court held that a person is seized "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). To determine what constitutes a sufficient "show of authority" for the purposes of determining whether a person has been restrained, "the Supreme Court has relied on a totality-of-the-circumstances test, asking whether a reasonable person would believe that he was 'not free to leave.'" *Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984) (internal quotation marks omitted)). However, in situations "where a person has no desire to leave the location of a challenged police encounter," the Second Circuit has recognized that "the 'free to leave' test may not be the best measure of a seizure." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 434–36 (1991)); *see generally Bostick*, 501 U.S. at 436 (framing the issue of whether a person being questioned as part of a police investigation aboard a bus was effectively seized under the Fourth Amendment as "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter").

In *Salmon*, the Second Circuit examined the Fourth Amendment right to be free from unlawful seizure of one's person under circumstances where an officer was alleged to have used physical restraint to eject a person from a public courthouse. *Salmon*, 802 F.3d at 251. In that circumstance, the court observed that the police officer "was not looking to question or search [a person] at a site where he wished to remain," nor was the officer "seeking to prevent [a person] from leaving the courthouse." *Id.* at 253. Rather, the officer was actively seeking the person's "departure from the courthouse." *Id.* To effect his departure, the officer did not simply "order or escort him from the courthouse, or [] use guiding force to direct him as needed." *Id.* at 254. Rather, the officer's method "was physically to grab him without encountering reprisal or resistance, and to use painful force to control" his movements. *Id.*

Against that factual backdrop, in *Salmon*, the Second Circuit held that, as a general rule, "an order to depart a public place that allows a person to go anywhere else he wishes does not, without more, effect a Fourth Amendment seizure." *Id.* at 257 (citing *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994)); *see also id.* at 253 (noting distinction between police conduct conveying that a person is not free to leave and that indicating that a person is not free to stay). The court also held that an order to depart a public place, when "accompanied by the use of sufficient force intentionally to restrain a person and gain control of his movements" may plausibly allege a seizure. *Id.* at 255; *see also, e.g.*, *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 523 (6th Cir. 2019) (adopting the Second Circuit's analysis in *Salmon* that an order to leave a location, without more, is not a seizure under the Fourth Amendment as long as the person is free to go where they wish, "at least in circumstances where the person being asked to leave is not privileged to remain in the space — either because the space is no longer open to the public . . . or because the person's behavior violated a rule, ordinance, or

law"). At the same time, the *Salmon* court noted that "any physical contact" by an officer does not automatically "transform an order to depart a public place into a Fourth Amendment seizure" of an individual. 802 F.3d at 255. Additionally, without more, "the mere threat of arrest does not constitute a Fourth Amendment violation." *Morris v. City of New York*, No. 14-CV-1749 (JG) (LB), 2015 WL 1914906, at *5 (E.D.N.Y. Apr. 27, 2015) (citing *Bodek v. Bunis,* No. 06-CV-6022L (DL), 2007 WL 1526423, at *9 (W.D.N.Y. May 23, 2007)).

The distinction between public spaces and dwelling places is significant in Fourth Amendment analysis. The Supreme Court has observed that: "When it comes to the Fourth Amendment, the home is first among equals" and "[a]t the Amendment's very core . . . stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Lange v. California*, 594 U.S. 295, 303 (2021) (quotation marks and alterations omitted). Relying in part on *Lange*, in *Sheppard v. Leuze* ("*Leuze*"), in which the court considered a motion to dismiss in a case where the plaintiff alleged that officers directed him to leave his home, the court held that "unlike a public place[,] a plaintiff can plead a Fourth Amendment seizure when he reasonably submits to an order to leave his home, even when the officers do not use 'physical force intentionally to restrain plaintiff and control his movements.'" No. 21-CV-2075 (KAM) (TAM), 2022 WL 2315981, at *4 (E.D.N.Y. June 27, 2022) (quoting *Salmon*, 802 F.3d at 257); *see also id.* at *3 (quoting *Grafton v. Fobelk*, No. 18 C 06099, 2019 WL 6716611, at *2 (N.D. Ill. Dec. 10, 2019) for the proposition that the constitutional question "'of whether a seizure has occurred when police officers merely instruct an individual to leave their *home*,' however, 'remains unresolved'" (emphasis added in *Leuze*) (internal quotation marks omitted)).

At the same time, a party's rights to remain on a property free from police interference "are limited by the boundaries of a party's right to occupy the premises." *Walker v. Mirbourn NPN 2 LLC*, No. 22-CV-2382 (RPK) (VMS), 2023 WL 11867001, at *8 (E.D.N.Y. Feb. 27, 2023) (discussing *Leuze*), *report and recommendation adopted*, Apr. 5, 2023 ECF Order Adopting R. & R. As the Second Circuit has observed in analyzing Fourth Amendment rights in the context of a search, "a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully." *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980). However, "[a] defendant can demonstrate that his own legitimate expectation of privacy has been infringed by showing that he owns the premises or property subjected to search, or by showing that he occupies and has dominion and control over the premises or property by leave of the owner." *Id.* at 63–64 (citations omitted). Also, in the context of the Fourth Amendment's warrant clause, the Second Circuit has observed that even where "a person might subjectively expect privacy in a particular location, that 'subjective expectation of privacy is legitimate' only 'if it is one that society is prepared to recognize as reasonable.'" *Figueroa v. Mazza*, 825 F.3d 89, 108 (2d Cir. 2016) (quoting *Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990) (internal quotation marks omitted)).

2. *Discussion*

Here, Plaintiff claims that he was unlawfully seized when the Defendant Officers directed him "to leave" his hotel room at the Fairfield Inn. Am. Compl., ECF 20, at ECF p. 8. Plaintiff further claims that the Defendant Officers told Plaintiff that he would be arrested for criminal trespass if he did not leave and Plaintiff "then left not to violate" his parole. *Id.* In response, the Defendant Officers argue that "Plaintiff does not allege that he was 'seized'" and that "Plaintiff does not allege that police forcibly removed him from the hotel: rather, he states that he left." Mem., ECF 68, at 17.

If the hotel where Plaintiff was staying was the equivalent of Plaintiff's home,[6] an inquiry into the totality of the circumstances — to determine whether a reasonable person would feel permitted to decline the officer's request or otherwise terminate the encounter — would be warranted. *See Salmon*, 802 F.3d at 253–54; *Bostick*, 501 U.S. at 436. According to the amended complaint, on the day Plaintiff was ultimately ejected from the hotel, the Defendant Officers arrived on the scene, knocked on Plaintiff's door, and, when Plaintiff opened the door, asked Plaintiff why he was not complying with Exodus's orders to vacate the hotel room. Am. Compl., ECF 20, at ECF p. 8. Plaintiff contends that he informed the Defendant Officers "that according to the rules of the contract he signed with Exodus, [Exodus] ha[s] no grounds to terminate the agreement that enables" Plaintiff to stay in the room. *Id.* Plaintiff adds that the Defendant Officers reviewed the referenced contract and determined that Plaintiff was not in violation of

[6] In evaluating whether a dwelling place qualifies as a home under the Fourth Amendment, the Second Circuit has distinguished between traditional homes or private rooms, over which a resident may have "dominion, control, and an ability to exclude others from the place in question," and other sorts of dwellings, such as college dormitories and rooming houses, where the occupant may have a lesser expectation of privacy. *Anobile v. Pelligrino*, 303 F.3d 107, 120 (2d Cir. 2002); *see also id.* (discussing the permissibility of warrantless searches of a home "directed at convicted felons still serving sentences of probation or parole"); *Figueroa v. Mazza*, 825 F.3d 89, 108–09 (2d Cir. 2016) (discussing factors for consideration in evaluating a person's Fourth Amendment privacy interests in dwellings other than their own home). For the purposes of the Fourth Amendment warrant requirement, a hotel room may constitute a person's home. *Lanza v. State of N.Y.*, 370 U.S. 139, 143 (1962); *see Cloud v. Scully*, 568 F. Supp. 1101, 1104 n.3 (S.D.N.Y. 1983) (noting that the plaintiff's "hotel room is, for purposes of Fourth Amendment analysis, the equivalent of his home") (citing *Stoner v. California*, 376 U.S. 483, 489–90 (1964)); *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 285 n.4 (S.D.N.Y. 2008) (collecting cases). Here, even taking Plaintiff's allegations that he was living in the hotel room as true, as the Court must in the motion to dismiss posture, Plaintiff's allegations do not establish that he had a constitutional right to continue in the Exodus program and to occupy a hotel room through their program indefinitely and over the objection of the Exodus managers. *See generally* Am. Compl., ECF 20, at ECF p. 10 (alleging that Plaintiff was given permission to occupy the hotel contingent on his participation in the Exodus program, including that he would "seek or obtain employment"); *see id.* at ECF p. 8 (alleging that the police's determination to tell Plaintiff to leave the premises followed "an Exodus employee" stating that Plaintiff had "threatened the staff").

the rules. *Id.* However, Plaintiff goes on to assert that one of the Defendant Officers "suggested after [the Exodus staff] pleaded with him to remove the Plaintiff that if [the Exodus staff] state[s] I threatened them, he has no choice but to remove [Plaintiff]." *Id.* Plaintiff then recounts that an Exodus employee claimed Plaintiff threatened them and one of the Defendant Officers told Plaintiff "to leave" his hotel room "because [Plaintiff] threatened the staff." *Id.* Plaintiff further claims that one of the Defendant Officers told Plaintiff to "leave or be arrested for criminal trespassing." *Id.* Ultimately, Plaintiff "then left not to violate" his parole. *Id.*

Under these circumstances, the Court acknowledges that a reasonable person in Plaintiff's position would not have felt "'free to decline the officers' requests'" to leave his hotel room "'or otherwise terminate the encounter.'" *Salmon*, 802 F.3d at 253 (quoting *Bostick*, 501 U.S. at 436). Plaintiff's encounter with the Defendant Officers involved "the threatening presence of police officers" and "language indicating that compliance with the officer is compulsory." *Gardiner v. Inc. Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995). Plaintiff's only realistic options were to comply by leaving the premises or be arrested, which would have compromised his parole conditions. *See Bennett v. Town of Riverhead*, 940 F. Supp. 481, 488 (E.D.N.Y. 1996) (threat by officer to arrest parent if parent did not turn child over to officer could constitute "seizure" for purposes of Fourth Amendment because "[plaintiff's] only options were to hand over her child or to be arrested; ignoring [the officer's] threat of arrest was impossible"). *But cf. Clarke v. County of Broome*, No. 1:10-CV-399 MAD/ATB, 2012 WL 1005086, at *11 (N.D.N.Y. Mar. 23, 2012) (distinguishing *Bennett*, 940 F. Supp. at 486, because the "plaintiff was able to and actually ignored" the defendant's "threats to arrest her," and the defendant "left the premises . . . without arresting plaintiff").

But even reading the complaint liberally in light of Plaintiff's *pro se* status, the Court finds that Plaintiff has not, and likely cannot, allege facts from which to infer that, for constitutional purposes, he was anything more than a guest at the hotel and that his host, Exodus, had determined that he was no longer welcome to stay. Under these circumstances, does a police order to vacate the premises on threat of arrest effect an unlawful seizure for purposes of the Fourth Amendment? For the following reasons, the answer is no.

In support of the argument that Plaintiff has failed to state a claim, the Defendant Officers cite *Jallow v. City of New York*, *Meyer v. Haines*, and *Barreto v. City of New York.* Mem., ECF 68, at 16–17; Reply, ECF 72, at 2; *see generally Jallow v. City of New York*, No. 20-CV-6260 (LGS), 2021 WL 6052125 (S.D.N.Y. Dec. 21, 2021); *Meyer v. Haines*, No. 1:24-CV-00791 (AJB/DJS), 2025 WL 1651154 (N.D.N.Y. June 11, 2025), *judgment entered*, 2025 WL 1651115 (N.D.N.Y. June 11, 2025), *and appeal withdrawn*, No. 25-1670-cv, 2025 WL 3996328 (2d Cir. Dec. 19, 2025); *Barreto v. City of New York*, No. 18-CV-9880 (LLS), 2019 U.S. Dist. LEXIS 94512, at *4 (S.D.N.Y. May 31, 2019). A close analysis of the facts of these cases is instructive.

In *Jallow*, the plaintiff alleged that he had been told by staff at a men's shelter that if he wanted to stay there, "he better stay quiet and let them do as they want," and that after various problematic interactions with the staff, NYPD officers arrived at the shelter, went into the plaintiff's room, escorted him downstairs, and one of the officers "grabbed his shirt in the process." 2021 WL 6052125, at *2. The court applied *Salmon* for the proposition that "[a]n officer's order to leave a certain area, even if accompanied by some physical contact, is not a seizure unless 'the order is accompanied by the use of sufficient force intentionally to restrain a person and gain control of his movements.'" *Id.* at *3 (quoting *Salmon*, 802 F.3d at 254). Accordingly, the court dismissed "any

underlying constitutional violation of false arrest" because the plaintiff's allegations "assert only that the officers forced [the p]laintiff to leave [a men's shelter] and not that he was held against his will." *Id.*

In *Meyer*, the plaintiffs comprised a group of hotel guests who claimed they were removed from a hotel by the hotel management due to noise complaints and other violations of hotel policy. 2025 WL 1651154, at *2. After hotel management asked them to leave, the *Meyer* plaintiffs refused, arguing that they could not travel on the Sabbath, which led the hotel management to call the police. *Id.* Once the police came, the officers took no steps to investigate the hotel's allegations, and they ultimately informed the plaintiffs that they could "leave on [their] own," or be arrested. *Id.* at *2–3. Eventually, the plaintiffs walked or were transported to the property of an associate about a mile away; none were arrested. *Id.* at *3. Granting the officers' motion to dismiss, the court found that "[a] claim for *threatened* arrest, seizure or search is not cognizable under the Fourth Amendment." 2025 WL 1651154, at *12 (quotation marks omitted) (emphasis in original).[7] Similarly, in *Barreto*, the plaintiff alleged that an officer ordered him to leave a

---

[7] The *Meyer* court relied on the Second Circuit's observation in *Salmon* that:

> Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes.

hotel he had been residing at or be arrested for trespassing. 2019 U.S. Dist. LEXIS 94512, at *4. The court ultimately found that the plaintiff's claim that "he was seized from entering his home" did not show that the plaintiff "was not free to leave," and that there was no unlawful seizure. *Id.* at *11 (quotation marks omitted).

Given Plaintiff's *pro se* status, the Court is duty bound to interpret his allegations to raise the strongest claims they suggest. The strongest argument here appears to be that Plaintiff's hotel room was his home for Fourth Amendment purposes and that unlike in *Barreto*, the officers unlawfully seized Plaintiff because he lacked a reasonable choice to *remain* in his home, not because he was precluded from entering his home. *See id.*

However, Plaintiff has not alleged facts from which to plausibly infer that the hotel room provided by Exodus was his home. *See generally Anobile v. Pelligrino*, 303 F.3d 107, 120 (2d Cir. 2002) (discussing factors, such as "dominion, control, and an ability to exclude others" as relevant to the analysis of whether a dwelling place should be afforded the protection of a home). On the contrary, Plaintiff's complaint makes clear that his permission to live in the hotel was contingent upon his compliance with the terms of the Exodus program contract. Am. Compl., ECF 20, at ECF pp. 10–11. Under these circumstances, Plaintiff was essentially a guest of Exodus's, and his Fourth Amendment rights as to the hotel room were "limited by the boundaries of [his] right to

---

*Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015); *see also Meyer v. Haines*, No. 1:24-CV-00791 (AJB/DJS), 2025 WL 1651154, at *12 (N.D.N.Y. June 11, 2025) (citing *Hamilton v. Vill. of Oak Lawn, Ill.*, 735 F.3d 967, 972 (7th Cir. 2013) (Posner, J.) ("[N]ot every expulsion is a confinement, let alone a seizure. The police didn't touch [the plaintiff] — didn't grab and fling her from the house, which could be a form of seizure. They didn't threaten her. They ordered her out, and she left. Had she refused to go, they would have had to arrest her to get her out, and we would have a different case.")), *judgment entered*, 2025 WL 1651115 (N.D.N.Y. June 11, 2025), *and appeal withdrawn*, No. 25-1670-cv, 2025 WL 3996328 (2d Cir. Dec. 19, 2025).

occupy the premises." *Walker*, 2023 WL 11867001, at *8. Although Plaintiff has alleged a contractual right to occupy the hotel premises based on his participation in the Exodus program, that is a far cry from the constitutional right to be free from unreasonable seizures in one's private home under the Fourth Amendment. *See supra* note 6. Plaintiff alleges no facts in the operative complaint, aside from conclusory assertions that he was not in violation of his contract with Exodus, to indicate that he had a constitutional right to stay in the hotel. Rather, based on the allegations in the complaint, for purposes of the Fourth Amendment, Plaintiff was at best, a guest whose invitation could be revoked and, at worst, "a 'mere trespasser' with 'no Fourth Amendment protection in premises he occupie[d] wrongfully.'" *Leuze*, 2022 WL 2315981, at *5 (quoting *Sanchez*, 635 F.2d at 64); *see* Am. Compl., ECF 20, at ECF pp. 5 (alleging that "Exodus employees kept threatening [Plaintiff] that once [he] leave[s] they are not letting [him] back in the room"), 6 (noting that Plaintiff "had to barricade [him]self in [his] room as Exodus continued to call police" and that "Exodus employees pleaded with" Officer Defendants to remove Plaintiff).

As discussed above, courts have repeatedly held that the Fourth Amendment does not guard against the police directing people to leave public spaces, including hotels and even a housing shelter, without a showing that some amount of force was used to restrain the person or gain control of his movements. *See generally Salmon*, 802 F.3d at 255. Here, given that Plaintiff's opportunity to be in the hotel was provided by the Exodus program, the pertinent question in this case is not whether Plaintiff had a right to stay in the hotel room, but whether his exclusion from the hotel at Exodus's request effected a violation of his constitutional rights. Plaintiff has not cited any caselaw in support of the proposition that an individual has a constitutionally protected right to stay in transitional housing provided by a non-governmental reentry program

and the Court is aware of none.[8] In light of the lack of authority in support of his claim, coupled with the well settled law that the threat of arrest, without more, is not sufficient to support a Fourth Amendment seizure claim, Plaintiff has failed to state a claim for unlawful seizure under the Fourth Amendment. *See Morris*, 2015 WL 1914906, at *5; *Meyer*, 2025 WL 1651154, at *12. As Plaintiff acknowledges in the amended complaint, when the Defendant Officers told him to leave on threat of arrest, he left without the officers' employing force. *See* Am. Compl., ECF 20, at ECF pp. 6, 8–9. Plaintiff was thereafter "free to go where he wishe[d]." *Salmon*, 802 F.3d at 253. Accordingly, the police conduct alleged here did not constitute an unlawful seizure under the Fourth Amendment. *See id.* For all of these reasons, the Court finds that Plaintiff has failed to state a plausible Fourth Amendment seizure claim.[9]

---

[8] The Court also notes that, even assuming the truth of Plaintiff's claim that the various officers who responded to the hotel made determinations that they could not evict or arrest Plaintiff if he was not in violation of his Exodus contract, the officers' discretionary determinations to not eject him immediately did not create any enforceable constitutional rights. The Court also notes that the facts changed over the course of time that Plaintiff was "barricaded in his room" and that different officers faced different factual circumstances. Am. Compl., ECF 20, at ECF p. 8. Although the Court in no way rests its decision on this observation, it is hard to imagine that staying "barricaded" in one's room for days was in compliance with the terms of the Exodus contract, which required, *inter alia*, participation in work and other programming. *Id.* at ECF pp. 10–11.

[9] As noted *supra* note 1, to the extent that Plaintiff attempts to raise a fabrication of evidence claim in his opposition, the claim is unavailing and time barred since more than three years have passed since the incident underlying this case. *See* Opp'n, ECF 71, at ECF p. 4; *see, e.g.*, *Mathie*, 267 F. App'x at 14. In any case, as the Defendant Officers point out, Plaintiff fails to state the required elements of a fabrication of evidence claim. Reply, ECF 72, at 2–3. "To succeed on a fabricated evidence claim, a plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.'" *Carruthers v. Colton*, 153 F.4th 169, 189 (2d Cir. 2025) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)). Here, Plaintiff clearly does not allege that any fabricated information was forwarded to prosecutors since he was never arrested. *See generally* Am. Compl., ECF 20; *see* Reply, ECF 72, at 3.

### C. Qualified Immunity

Finally, the Defendant Officers assert in passing that "[a]t the very least, the [Defendant Officers] are entitled to qualified immunity, as it is not clearly established that a police officer violates a person's Fourth Amendment rights by ordering that person to leave an area, with which that person complies." Mem., ECF 68, at 17. Although the Court "notes that many cases involving an order to leave a home 'are decided on qualified immunity grounds,'" because the Defendant Officers "do not raise" a complete qualified immunity defense "at this stage," "the court will not raise such a defense for them." *Leuze*, 2022 WL 2315981, at *5; *see Zuleta v. Krom*, No. 24-CV-2363 (KMK), 2025 WL 2721004, at *8 n.3 (S.D.N.Y. Sept. 24, 2025) (noting that "because Defendants make no actual arguments about why they are entitled to qualified immunity but instead only cite generic caselaw, the Court will not consider this argument at this time" (quotation marks omitted)) (collecting cases).

## III. Plaintiff's *In Forma Pauperis* Status and the Request for a Filing Injunction

### A. Plaintiff's *In Forma Pauperis* Status

The IFP statute was "designed to ensure that indigent litigants have meaningful access to the federal courts" and waives the pre-payment of filing fees for prisoners with limited financial means. *Neitzke v. Williams*, 490 U.S. 319, 324 (1989). In 1996, "[h]owever, concerned by the resulting rise of an 'outsize share of prisoner filings' and a 'flood of nonmeritorious claims,' Congress enacted the PLRA . . . to curb abuses of the IFP privilege and ensure 'fewer and better prisoner suits.'" *Jones v. Moorjani*, No. 13-CV-2247 (PAC) (JLC), 2013 WL 6569703, at *3 (S.D.N.Y. Dec. 13, 2013) (alterations omitted) (quoting *Jones v. Bock*, 549 U.S. 199, 203 (2007)), *report and recommendation adopted*, 2014 WL 351628 (S.D.N.Y. Jan. 31, 2014). As relevant here, the PLRA includes a "three-strikes" provision, which states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). Accordingly, after a plaintiff acquires three "strikes," "a court may revoke a prisoner's IFP status and dismiss the complaint," "[a]fter giving the plaintiff notice and an opportunity to be heard." *Lurch v. Kim ("Kim")*, No. 22-CV-2324 (VSB), 2025 WL 1091347, at *1 (S.D.N.Y. Mar. 7, 2025) (citing *Polanco v. Hopkins*, 510 F.3d 152, 156 (2d Cir. 2007); *Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998)).

In support of the request for a revocation of Plaintiff's IFP status, the Defendant Officers offer three cases: (1) *Lurch, Sr. v. New York City Department of Corrections*, No. 16-CV-3835 (S.D.N.Y.); (2) *Lurch, Jr. v. City of New York*, No. 18-CV-2379 (S.D.N.Y.); and (3) *Lurch v. Menendez*, No. 19-CV-6011 (E.D.N.Y.). *See* Mem., ECF 68, at 19–22. The Court agrees with the Honorable Vernon S. Broderick that *Lurch, Sr. v. New York City Department of Corrections* ("*Lurch, Sr.*") and *Lurch, Jr. v. City of New York* ("*Lurch, Jr.*") clearly constitute two strikes. *Kim*, 2025 WL 1091347, at *2–3. In evaluating *Lurch, Sr.*, the court dismissed the complaint "for failure to state a claim and without leave to replead" and "[t]his dismissal therefore constitutes a strike." *Id.* at *2. As for *Lurch, Jr.*, the court dismissed the case because Mr. Lurch had not adequately alleged his claims under *Heck v. Humphrey*, 512 U.S. 477 (1994). *Id.* at *3. The court "also concluded that granting Lurch leave to amend would be futile because the defects in his complaint cannot be cured with an amendment." *Id.* Ultimately, "[s]ince dismissals under *Heck* that are irremediable count as strikes, the dismissal of *Lurch, Jr. v. City of New York* is Lurch's second strike under § 1915(g)." *Id.* (citation omitted).

As for *Lurch v. Menendez*, however, the Court is unconvinced that the dismissal of that case at summary judgment constitutes a strike under § 1915(g), particularly in light of the voluminous and complex summary judgment record that was developed in that action. *See generally* Docket, *Lurch v. Menendez*, No. 19-CV-6011 (E.D.N.Y.). The Defendant Officers contend that in *Menendez*, "this Court relied on established authority permitting courts to disregard 'conclusory' allegations where they are so improbable as to defy plausibility — the standard for dismissal under Rule 12(b)(6)." Mem., ECF 68, at 22. However, "[c]ourts in this circuit have routinely held that a dismissal at the summary judgment stage generally does not count as strike for purposes of section 1915(g)." *Cruz v. Zwart*, No. 9:13-CV-1287, 2014 WL 4771664, at *3 (N.D.N.Y. Sept. 24, 2014) (collecting cases); *see Ramsey v. Goord*, No. 05-CV-47A, 2007 WL 1199573, at *2 (W.D.N.Y. Apr. 19, 2007) ("[A] dismissal on summary judgment is generally not considered within the parameters of the three-strikes rule's requirement that the actions be dismissed as frivolous, malicious, or for failure to state a claim.") (collecting cases). The Defendant Officers' argument to the contrary is unconvincing. Notwithstanding the Court's ultimate conclusion in *Menendez* that "no reasonable jury could return a verdict for Plaintiff," the case was not dismissed outright as frivolous and presented many complexities, as detailed in the Court's lengthy, highly fact-intensive summary judgment opinion. *Lurch v. Menendez*, No. 19-CV-6011 (DG) (TAM), 2025 WL 2922543, at *1 (E.D.N.Y. Aug. 1, 2025), *report and recommendation adopted*, Aug. 25, 2025 Order Adopting R. & R.; *see also Lurch v. City of New York*, No. 19-CV-6011 (AMD) (SJB), 2019 WL 6773216, at *3 (E.D.N.Y. Dec. 12, 2019) (granting Plaintiff leave to proceed *in forma pauperis* against one police officer, later identified as Officer Menendez). Accordingly, the Court respectfully recommends denying the Defendant Officers' request to revoke Plaintiff's IFP status based on these three cases.

**B. Defendant Officers' Request for a Filing Injunction**

Defendant Officers also request that the Court impose a filing injunction on Plaintiff. *See* Mem., ECF 68, at 23–24. The Second Circuit has directed courts to consider the following factors when evaluating whether to restrict a litigant's access to the courts:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Iwachiw v. New York State Dept. of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir. 2005) (quoting *Safir v. United States Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986)) (per curiam); *see also Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 714 (2d Cir. 2019) (per curiam).

Here, a balancing of the *Safir* factors weighs against imposing a filing injunction at this time. The Court acknowledges that Plaintiff has brought numerous lawsuits in the Eastern and Southern Districts of New York, which have imposed substantial burdens on the Court, Corporation Counsel, and other litigants. *See* Mem., ECF 68, at 11 n.2, 24. However, as discussed above, not all of Plaintiff's lawsuits are without merit and many of them raise civil rights and constitutional claims. *See, e.g.*, *Menendez*, 2025 WL 2922543, at *5 (reaching summary judgment); *see id.* at *5 n.9 (discussing two cases Plaintiff brought in the Southern District of New York, *Lurch v. City of New York*, No. 19-CV-4350 (PAE) (JLC) (S.D.N.Y.), and *Lurch v. Sergeant One*, No. 18-CV-9592 (NSR) (S.D.N.Y.), one of which resulted in a settlement for Plaintiff); Stipulation of Dismissal, ECF 68, *Lurch v. City of New York*, No. 19-CV-4350 (PAE) (JLC); *see also generally* Suppl. Opp'n, ECF 74, at ECF pp. 8–9 (representing that Plaintiff has filed six separate actions

against the City of New York where the City ultimately settled with him and positing that his claims "are not categorically frivolous and that, when fully litigated, my claims have had sufficient merit to warrant favorable outcomes").

Indeed, in this very case, Defendant Exodus reached a settlement with Plaintiff regarding his claims against that entity. *See* Reply, ECF 72, at 6 (acknowledging Plaintiff's settlement with Exodus regarding this matter); Opp'n, ECF 71, at ECF p. 6; *see also* Stipulation of Dismissal, ECF 40. While the Court acknowledges that a settlement does not indicate a concession that Plaintiff's claims are meritorious, Plaintiff's success in securing a settlement with Exodus indicates a good faith expectation that his claims will prevail. *But cf.* Reply, ECF 72, at 6–7. In addition, Plaintiff's *pro se* status affords him "'special solicitude,'" *Eliahu*, 919 F.3d at 715 (quoting *Triestman*, 470 F.3d at 477), and "'weighs against an injunction,'" *Ratner v. Robinson*, No. 13-CV-6278 (JS) (ARL), 2015 WL 6965077 (E.D.N.Y. Nov. 10, 2015) (quoting *Davey v. Dolan*, 453 F. Supp. 2d 749, 756 (S.D.N.Y. 2006), *aff'd*, 292 F. App'x 127 (2d Cir. 2008)).

Accordingly, the Court respectfully recommends denying the Defendant Officers' request to impose a filing injunction at this time. The Court strongly cautions Plaintiff, however, that the filing of vexatious, harassing, or frivolous lawsuits may warrant a filing injunction in the future or revocation of his eligibility for *in forma pauperis* status. Although the Court recognizes that Plaintiff may have achieved some success in prior lawsuits, Plaintiff must be very careful in determining whether and when to press claims, and most importantly, against whom. Given Plaintiff's history, which includes the filing of "nearly thirty lawsuits in the Eastern and Southern Districts alone," *Menendez*, 2025 WL 2922543, at *21, although the Court recommends denying the City's request for a filing injunction in this case, that denial should be without prejudice to re-raise this request in the future.

## CONCLUSION

For the reasons discussed herein, the Court recommends that the Defendant Officers' motion to dismiss be granted, and that Plaintiff's claims be dismissed. The Court further respectfully recommends denying the Defendant Officers' request to revoke Plaintiff's IFP status and impose a filing injunction, without prejudice.

* * * * *

This report and recommendation will be filed electronically. Objections to this report and recommendation must be filed, with a courtesy copy sent to the Honorable Diane Gujarati at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See, e.g.*, *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate[ judge's] decision" (quotation marks omitted)).

**SO ORDERED.**

Dated: Brooklyn, New York
July 30, 2026

Taryn A. Merkl
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE